# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP304-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent-Petitioner, |
| |     v. |
| | Richard L. Weber, |
| |         Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | November 29, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 6, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Wood |
|   JUDGE: | Gregory J. Potter |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | KELLY, D., J. concurs (Opinion filed). |
|   DISSENTED: | BRADLEY, A. W., J. dissents (Opinion filed). |
| | BRADLEY, R. G., J. dissents, joined by ABRAHAMSON, J. (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner the cause was argued by *Nancy A. Noet*, assistant attorney general, with whom on the brief(s) was *Brad D. Schimel*, attorney general.

For the defendant-appellant, there was a brief and oral argument by *Kara L. Mele*, assistant state public defender.

2016 WI 96

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP304-CR
(L.C. No. 2012CF274)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

  **v.**

**Richard L. Weber,**

      **Defendant-Appellant.**

**FILED**

**NOV 29, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals, State v. Weber, No. 2014AP304-CR, unpublished slip op. (Wis. Ct. App. Oct. 8, 2015) (per curiam), which reversed the Wood County circuit court's[1] order denying defendant Richard Weber's ("Weber") motion to suppress evidence of drunk driving, possession of marijuana, and possession of drug paraphernalia, and remanded the case to the circuit court with directions to vacate its judgment of conviction, permit Weber to withdraw his plea, and grant Weber's

---

[1] The Honorable Gregory J. Potter presided.

motion to suppress evidence. Weber, unpublished slip op., ¶¶1, 10.

¶2 A deputy of the Wood County sheriff's department attempted to pull Weber over on a public highway by activating the emergency lights on his vehicle after observing that Weber's vehicle had a defective high-mounted brake lamp and watching the vehicle weave over the highway's fog line. When Weber failed to yield to the traffic stop, the deputy pursued Weber into his driveway and apprehended him in his garage. The question before this court is whether the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber violated the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution, or whether the need for a warrant was obviated by the exigent circumstance of the deputy's "hot pursuit" of a fleeing suspect who had committed jailable offenses. See, e.g., United States v. Santana, 427 U.S. 38 (1976).

¶3 We conclude that the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber were constitutional because they were justified by the exigent circumstance of hot pursuit of a fleeing suspect who had committed jailable offenses. The deputy had probable cause to believe that Weber had committed two jailable offenses, immediately pursued Weber, and performed a limited entry into Weber's open garage for the purpose of preventing Weber's continued flight. Under these specific circumstances, the

2

deputy's actions were constitutionally reasonable. Accordingly, we reverse the decision of the court of appeals.

## I. FACTUAL BACKGROUND

¶4 On April 20, 2012, Deputy Calvin Dorshorst ("Deputy Dorshorst") of the Wood County sheriff's department and Weber were driving in separate vehicles in Arpin, Wisconsin. Deputy Dorshorst observed that the high-mounted brake lamp on Weber's vehicle was not working properly and saw Weber's vehicle "weave from its lane of travel" "[o]ver the white fog line." Deputy Dorshorst activated his vehicle's emergency lights in an attempt to conduct a traffic stop. Weber did not, however, stop his vehicle. Instead, he drove about 100 feet, turned into a driveway, and pulled into an attached garage. Deputy Dorshorst followed the vehicle and parked 15 to 20 feet behind it but outside of the garage with his vehicle's emergency lights still on. At some point during this process, Deputy Dorshorst "contact[ed] dispatch notifying them [he] had a traffic stop."

¶5 Weber and Deputy Dorshorst exited their vehicles at about the same time. Weber began moving toward a door of the attached house inside the garage. Deputy Dorshorst ran to the front of his vehicle and in the direction of the garage, where he witnessed Weber "walking slowly" and "somewhat staggering" up steps inside the garage leading to the door to the house. As Deputy Dorshorst ran toward Weber he told Weber to stop and that

3

he needed to speak with him.[2] Weber did not stop but instead continued up the steps to the house. Deputy Dorshorst entered the garage and "secured [Weber's] arm" as Weber was "just inside his [house's] door" at the top of the steps. Weber stopped and Deputy Dorshorst explained that he had stopped Weber because of the defective high-mounted brake lamp on Weber's vehicle. Deputy Dorshorst asked Weber to accompany him to Weber's vehicle so that Deputy Dorshorst could "point out exactly the reason for the stop and which light was defective." During this time Weber tried to pull away from Deputy Dorshorst and enter his house. Deputy Dorshorst noticed that Weber had "slow, slurred speech" and "glassy, bloodshot eyes." Additionally, Deputy Dorshorst could smell "a strong odor of intoxicants."

¶6 Weber and Deputy Dorshorst eventually exited the garage and walked back outside, where Deputy Dorshorst asked Weber if he had been drinking. Weber informed Deputy Dorshorst that "he was drinking at his residence and a while after drinking a couple of beers, he left and went to the Village of Arpin, at which time . . . he went to another place and was drinking." Weber was "unable to identify" the location in Arpin to which he had traveled. After consuming "a few drinks" there, Weber explained, he had returned to his home. Weber informed

---

[2] There may be some dispute as to the deputy's position at the time he first spoke to Weber. For a discussion, see infra, n.8.

4

Deputy Dorshorst that he thought he had had "way too much" alcohol.

¶7 Deputy Dorshorst asked Weber to perform field sobriety tests, but Weber refused. Weber then tried to leave and reenter his garage, but Deputy Dorshorst advised Weber he was not free to do so. Weber "aggressively pushed into [Deputy Dorshorst's] chest with his head" around the same time that a second deputy pulled into the driveway. Deputy Dorshorst told Weber a second time that he was not free to leave. Weber "continued to resist," and the two deputies "escorted the defendant to the ground and secured his arms." Weber was put in handcuffs and placed under arrest.

¶8 The deputies searched Weber and he consented to a search of his vehicle. In the vehicle the deputies found "a tinfoil square folded up with [a] green leafy vegetable substance inside, which was later tested positive for [tetrahydrocannabinols]," as well as a "metal pipe in the ashtray of the vehicle." The pipe "had a burned residue inside it" and "smelled of burnt marijuana."

¶9 Weber was eventually taken to a hospital where his blood was drawn. Later analysis of his blood showed a blood alcohol concentration of 0.24.

## II. PROCEDURAL BACKGROUND

¶10 On July 9, 2012, a criminal complaint was filed against Weber in Wood County circuit court charging him with one

count of operating while intoxicated, contrary to Wis. Stat. § 346.63(1)(a) (2011-12),[3] tenth and subsequent offense, see Wis. Stat. § 346.65(2)(am)7.; one count of operating with a prohibited alcohol concentration, contrary to § 346.63(1)(b), tenth and subsequent offense, see § 346.65(2)(am)7.; one count of possession of tetrahydrocannabinols, contrary to Wis. Stat. § 961.41(3g)(e); possession of drug paraphernalia, contrary to Wis. Stat. § 961.573(1); and resisting an officer, contrary to Wis. Stat. § 946.41(1). On August 14, 2012, an information was filed in the case.

¶11 On October 24, 2012, Weber filed a motion collaterally attacking one of his prior convictions for drunk driving on the ground that he had not properly waived his right to counsel when entering his plea in that case. On October 29, 2012, Weber also moved the circuit court

> for an order excluding [Weber's] illegal arrest and evidence obtained as a result of the illegal arrest, including but not limited to the following: the blood alcohol concentration, officer's observations including glassy eyes, slurred speech, and odor of intoxicants, statements made by defendant, defendant's refusal to perform field sobriety tests, a metal pipe believed to be drug paraphernalia, and tin foil containing a green leafy vegetable substance believed to be tetrahydrocannabinols.

¶12 On February 21, 2013, the circuit court granted Weber's motion collaterally attacking one of his prior convictions but denied Weber's suppression motion. As to the

---

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

6

latter ruling, the circuit court concluded that Deputy Dorshorst's actions were justified by the exigent circumstance of hot pursuit. Specifically, Weber was fleeing Deputy Dorshorst's lawful attempts to stop him, Deputy Dorshorst had probable cause to believe that Weber was committing a crime in so doing, and Deputy Dorshorst's pursuit of Weber for this offense was "promptly made and maintained."

¶13 On May 23, 2013, an amended information was filed in the case. On the same day, Weber pleaded no contest to operating with a prohibited alcohol concentration, ninth offense, possession of tetrahydrocannabinols, and resisting an officer. The other two counts against Weber were dismissed. On August 6, 2013, the circuit court sentenced Weber to four years of initial confinement and four years of extended supervision on the operating with a prohibited alcohol concentration charge and ordered that Weber pay costs on the other two offenses. On August 12, 2013, the court's judgment of conviction of Weber was filed. On January 30, 2014, Weber filed a notice of appeal.

¶14 On October 8, 2015, the court of appeals reversed the circuit court's order denying Weber's motion to suppress evidence and remanded the case to the circuit court with directions to vacate its judgment of conviction, permit Weber to withdraw his plea, and grant Weber's motion to suppress. Weber, unpublished slip op., ¶¶1, 10. The court of appeals explained that "the exigent circumstances requirement means that there must be a potential for danger to life, risk of evidence destruction, or likelihood of escape." Id., ¶7. The court

7

added that the State failed to explain how this standard was met; the State instead "appear[ed] to assume that all hot pursuits qualify as exigent circumstances" but "provide[d] no legal argument to support that assumption." Id., ¶¶8-9. The court itself "fail[ed] to discern why an immediate warrantless entry was justified" and ultimately reversed on the ground that the State had conceded Weber's argument by failing to rebut it. Id., ¶9 (citing Charolais Breeding Ranches, Ltd. V. FPC Sec. Corp., 90 Wis. 2d 97, 108-09, 279 N.W.2d 493 (Ct. App. 1979)).

¶15 On November 6, 2015, the State filed a petition for review in this court. On February 3, 2016, this court granted the petition.

### III. STANDARD OF REVIEW

¶16 "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact." State v. Iverson, 2015 WI 101, ¶17, 365 Wis. 2d 302, 871 N.W.2d 661 (quoting State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463). In answering these types of questions, this court "review[s] the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous," then "independently appl[ies] constitutional principles to those facts." Id., ¶18 (quoting Robinson, 327 Wis. 2d 302, ¶22).

### IV. ANALYSIS

¶17 The Fourth Amendment to the United States Constitution provides:

8

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[4]  Article I, Section 11 of the Wisconsin Constitution is a "substantively identical provision . . . that this court interprets consistently with the Fourth Amendment." State v. Richter, 2000 WI 58, ¶27, 235 Wis. 2d 524, 612 N.W.2d 29 (citing State v. Secrist, 224 Wis. 2d 201, 208, 589 N.W.2d 387 (1999)).

¶18  "It is a '"basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."'   Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (citation omitted) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)). Relevant to the warrantless home entry that occurred in this case,[5] this court has recognized that "a home entry, though unaccompanied by a warrant, is lawful if 'exigent circumstances'

---

[4] The Fourth Amendment applies to the states through the Fourteenth Amendment.  E.g., State v. Kramer, 2009 WI 14, ¶18 & n.6, 315 Wis. 2d 414, 759 N.W.2d 598 (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

[5] The State does not disagree with Weber's position that his garage was protected under the Fourth Amendment as curtilage of his home.  See, e.g., State v. Davis, 2011 WI App 74, ¶¶9-15, 333 Wis. 2d 490, 798 N.W.2d 902.

are present," a condition satisfied when "it would be unreasonable and contrary to public policy to bar law enforcement officers at the door." State v. Ferguson, 2009 WI 50, ¶19, 317 Wis. 2d 586, 767 N.W.2d 187 (quoting Richter, 235 Wis. 2d 524, ¶28).

> [T]here are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee.

Id., ¶20 (quoting Richter, 235 Wis. 2d 524, ¶29).  The State argues that the first of these categories, hot pursuit, justified Deputy Dorshorst's actions in this case.

¶19 Before this court will uphold Deputy Dorshorst's warrantless entry on the grounds asserted, the State must "show[] that the warrantless entry was both supported by probable cause and justified by exigent circumstances."

Robinson, 327 Wis. 2d 302, ¶24.[6] We now assess these two components of the State's claim.

## A. Probable Cause

¶20 "The probable cause requirement in the arrest context protects an individual's interest in his or her personal liberty. Thus, the proper inquiry in an arrest challenge is whether probable cause exists to believe that a particular suspect has committed a crime." State v. Hughes, 2000 WI 24, ¶20, 233 Wis. 2d 280, 607 N.W.2d 621 (citing State v. Kiper, 193 Wis. 2d 69, 82, 532 N.W.2d 698 (1995)).

> Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime. There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not.

---

[6] One fact that we need not consider in this case is Deputy Dorshorst's "subjective motivation" for entering Weber's garage. Brigham City v. Stuart, 547 U.S. 398, 404 (2006). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Id. (alteration in original) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)). "[W]hen an officer's Fourth Amendment search and seizure conduct is supported by an objectively ascertainable basis for probable cause or reasonable suspicion, the police conduct meets the Fourth Amendment's requirement of reasonableness, thereby causing subjective motivations to be of little concern." Kramer, 315 Wis. 2d 414, ¶27 (citing Whren v. United States, 517 U.S. 806, 811 (1996)).

11

<u>Secrist</u>, 224 Wis. 2d at 212 (citations omitted). The test to determine probable cause is objective, <u>cf., e.g.</u>, <u>Robinson</u>, 327 Wis. 2d 302, ¶26 (search case), and requires an examination of the totality of the circumstances. <u>Kiper</u>, 193 Wis. 2d at 82 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). Further, "probable cause eschews technicality and legalisms in favor of a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" <u>Secrist</u>, 224 Wis. 2d at 215 (quoting <u>Kiper</u>, 193 Wis. 2d at 83).

¶21 The State argues that at the time of Deputy Dorshorst's entry into Weber's garage, Deputy Dorshorst "had probable cause to believe that Weber had committed two jailable offenses," namely violations of Wis. Stat. §§ 346.04(2t) ("Obedience to traffic officers, signs and signals; fleeing from officer.") and 946.41(1) ("Resisting or obstructing officer."). The first of these statutes provides, "No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits." § 346.04(2t). The second of these statutes criminalizes "knowingly resist[ing] or obstruct[ing] an officer while such officer is doing any act in an official capacity and with lawful authority." § 946.41(1). Each of these offenses is punishable by a fine of $10,000, imprisonment for up to nine months, or both. Wis. Stat. §§ 346.17(2t), 946.41(1), 939.51(3)(a).

¶22 In response, Weber argues that probable cause was lacking for both jailable offenses because Deputy Dorshorst possessed no evidence that Weber "knowingly resist[ed]," Wis. Stat. §§ 346.04(2t), or "knowingly . . . obstruct[ed]," Wis. Stat. § 946.41(1), Deputy Dorshorst.[7]

¶23 We conclude that at the time he entered Weber's garage, Deputy Dorshorst had probable cause to arrest Weber for violations of Wis. Stat. §§ 346.04(2t) and 946.41(1). Deputy Dorshorst activated his emergency lights while driving behind Weber's vehicle but Weber failed to pull over. Deputy Dorshorst pulled his flashing vehicle into Weber's driveway and parked it behind Weber's vehicle before Weber had even exited it, but Weber did not acknowledge the attempted stop. Deputy Dorshorst called after Weber, but Weber made no reply. "We evaluate the existence of probable cause objectively, concerned with whether law enforcement acted reasonably." Robinson, 327 Wis. 2d 302, ¶26 (search case). Our focus is not on whether Weber in fact fled Deputy Dorshorst, but instead whether the circumstances would have led a reasonable law enforcement officer to believe that Weber was probably fleeing him. See Secrist, 224 Wis. 2d at 212. A reasonable law enforcement officer would conclude on this evidence that Weber was likely feigning ignorance and thus fleeing; most individuals would have responded to Deputy Dorshorst's obvious attempts to catch his

---

[7] Weber does not develop independent arguments relating to other portions of the statutes.

13

attention. Cf. State v. Stewart, 143 Wis. 2d 28, 35, 420 N.W.2d 44 (1988) ("Intent may be inferred from the defendant's conduct . . . .").

¶24 Our conclusion that Deputy Dorshorst possessed probable cause to arrest Weber is only bolstered by the circuit court's finding that Weber was in fact "fleeing the deputy in order to avoid the stop," a finding which is not clearly erroneous because it is not "contrary to the great weight and clear preponderance of the evidence." State v. Popke, 2009 WI 37, ¶20, 317 Wis. 2d 118, 765 N.W.2d 569 (quoting State v. Turner, 136 Wis. 2d 333, 343, 401 N.W.2d 827 (1987)). Consequently, we are "bound not to upset" the court's factual finding. Id. (emphasis added) (quoting Turner, 136 Wis. 2d at 343); see also Iverson, 365 Wis. 2d 302, ¶18 (characterizing applicable standard of review as "deferential" (quoting Robinson, 327 Wis. 2d 302, ¶22)).

¶25 Weber contends that Deputy Dorshorst's verbal directive to Weber to stop as Weber neared his door is irrelevant to a probable cause analysis because Weber was already in the garage when it was issued. We reject this argument. The relevant question at this stage of the analysis is whether an officer would reasonably conclude prior to the officer's warrantless entry that Weber had committed a jailable offense and was now fleeing from arrest for that crime. Cf., e.g., Santana, 427 U.S. at 42 ("In Warden v. Hayden, 387 U.S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few

14

minutes before, to make a warrantless entry to arrest the robber and to search for weapons."). Weber's failure to respond to highly noticeable "visible [and] audible signal[s]" directed at him while he was in the street and in his garage, Wis. Stat. § 346.04(2t), strongly suggested that he was in the process of knowingly fleeing Deputy Dorshorst's lawful stop. We stress that "an officer's conclusions must be reasonable under the circumstances, not technically certain." Secrist, 224 Wis. 2d at 215.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same——and so are law enforcement officers.

Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). This court can properly consider Deputy Dorshorst's oral commands.[8]

---

[8] Weber comments that "[t]he circuit court did not make an explicit finding as to whether the deputy was inside or outside the garage when he first spoke to [Weber]." A fair reading of the record makes clear that a finding that Deputy Dorshorst was outside the garage at the time he first spoke to Weber was at least implicit. Deputy Dorshorst specifically testified that he was not in the garage prior to first speaking to Weber. The circuit court concluded that "[o]nce inside the garage, [Weber] did not wait for the deputy to approach," but "instead attempted to flee the deputy, even after obtaining verbal commands." The court then continued, "because of the defendant's actions, the deputy took pursuit." (Emphasis added.) In other words, the court found that Weber's failure to respond to Deputy Dorshorst's verbal commands partly caused and thus preceded Deputy Dorshorst's entry into the garage.

(continued)

15

¶26 Before he entered Weber's garage, the evidence before Deputy Dorshorst suggested, at the very least, that it was as likely as not that Weber had committed jailable offenses by failing to pull to the side of the road as soon as reasonably possible. Consequently, Deputy Dorshorst possessed probable cause to arrest Weber. See Secrist, 224 Wis. 2d at 212 (citing State v. Mitchell, 167 Wis. 2d 672, 681-82, 482 N.W.2d 364 (1992)). To conclude that probable cause does not exist on these facts could be construed as a sea change in the law. Weber's defense as to why he did not pull over earlier, instead proceeding into his garage and attempting to enter his home, all while the law enforcement vehicle had its emergency lights activated and despite Deputy Dorshorst calling out to him, is a question for the jury to weigh and consider but is not determinative of probable cause. The court's determination of probable cause is distinct from a defense. Neither statute at issue prescribes a time or distance requirement. This court should neither read such a requirement into the statute nor

---

But even if the circuit court failed to make a specific finding on this point, to the extent such a finding would be outcome-determinative, we can assume the trial court made it. See State v. Echols, 175 Wis. 2d 653, 673, 499 N.W.2d 631 (1993) ("When a trial court does not expressly make a finding necessary to support its legal conclusion, an appellate court can assume that the trial court made the finding in the way that supports its decision." (citing State v. Wilks, 117 Wis. 2d 495, 503, 345 N.W.2d 498 (Ct. App. 1984), aff'd, 121 Wis. 2d 93, 358 N.W.2d 273 (1984)).

16

conflate the question of probable cause with a potential defense.

## B. Exigent Circumstances

¶27 We must next examine whether the exigencies of the situation justified Deputy Dorshorst's entry into Weber's garage, or whether Deputy Dorshorst was constitutionally required to obtain an arrest warrant. As discussed, the State relies on Deputy Dorshorst's "hot pursuit" of Weber to validate the entry.[9]

¶28 Both this court and the Supreme Court of the United States have recognized that "law enforcement officers may make a warrantless entry onto private property . . . to engage in '"hot pursuit"' of a fleeing suspect." Stuart, 547 U.S. at 403 (quoting Santana, 427 U.S. at 42-43); see, e.g., Ferguson, 317 Wis. 2d 586, ¶20 (characterizing "hot pursuit of a suspect" as one of several "well-recognized categories of exigent circumstances" (quoting Richter, 235 Wis. 2d 524, ¶29)). The basic ingredient of the exigency of hot pursuit is "immediate or continuous pursuit of [a suspect] from the scene of a crime." Richter, 235 Wis. 2d 524, ¶32 (alteration in original) (quoting State v. Smith, 131 Wis. 2d 220, 232, 388 N.W.2d 601 (1986), abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775).

---

[9] Instead of relying on theories that were not briefed or argued, we base our conclusions on the long-established doctrine of hot pursuit.

17

¶29 For example, in Santana, a seminal case on hot pursuit, the Supreme Court concluded that officers with probable cause to arrest a defendant standing in the threshold of her residence and who "retreat[ed] into . . . her house" as the officers attempted to seize her could enter "through the open door" and "catch[] her in the vestibule." Santana, 427 U.S. at 40, 42-43. And in Richter, this court determined that an officer responding to a report of a burglary at a trailer park who was told by the victim upon arrival that the burglar had entered a certain trailer could enter that trailer without a warrant. Richter, 235 Wis. 2d 524, ¶¶1-2.

¶30 Again, "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and "the warrant requirement is subject to certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011) (alteration in original) (quoting Stuart, 547 U.S. at 403). The necessity——and thus intuitive reasonableness——of a hot pursuit doctrine in our constitutional law is apparent. In many cases, hot pursuit into a residence will serve the purposes of protecting a home's occupants, c.f., e.g., Hayden, 387 U.S. at 298-99, or preventing the destruction of evidence. See, e.g., Santana, 427 U.S. at 43. But "[e]xigent circumstances exist when 'it would be unreasonable and contrary to public policy to bar law enforcement officers at the door,'" Ferguson, 317 Wis. 2d 586, ¶19 (quoting Richter, 235 Wis. 2d 524, ¶28), and even in the absence of these additional benefits, the hot pursuit doctrine serves an important public policy purpose:

18

> Law enforcement is not a child's game of prisoner[']s base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence . . . must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant.

State v. Sanders, 2008 WI 85, ¶133, 311 Wis. 2d 257, 752 N.W.2d 713 (Prosser, J., concurring) (alteration in original) (quoting State v. Blake, 468 N.E.2d 548, 553 (Ind. Ct. App. 1984)); see also Santana, 427 U.S. at 42 (refusing to permit a defendant to "thwart an otherwise proper arrest" by withdrawing into her home). "[C]reating an incentive for . . . suspects to flee to the home to escape lawful arrest," Sanders, 311 Wis. 2d 257, ¶133 (Prosser, J., concurring), generates disrespect for the law and for law enforcement, risks putting the public and any participants in the chase in harm's way, and expends valuable law enforcement resources. Consequently, the hot pursuit doctrine helps ensure that a criminal suspect will not be rewarded for fleeing the police and that the police will not be penalized for completing a lawful attempt to apprehend a suspect, who, by his own actions, has drawn the police into his home.

¶31 Before proceeding, we reemphasize an important dimension of the hot pursuit doctrine. In Welsh v. Wisconsin, 466 U.S. 740 (1984), which was not a hot pursuit case, Welsh, 466 U.S. at 753, the Supreme Court characterized its earlier decision in Santana as involving the "hot pursuit of a fleeing

19

felon." Id. at 750 (emphasis added) (citing Santana, 427 U.S. at 42-43). The court also concluded that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." Id. at 753. After Welsh, some uncertainty existed regarding whether the hot pursuit doctrine was limited to those cases where officers were in pursuit of a "fleeing felon." Compare, e.g., Sanders, 311 Wis. 2d 257, ¶¶77-83, 122, 134 (Prosser, J., concurring), with id., ¶¶147, 149, 152 (Butler, J., concurring).

¶32 In Ferguson this court concluded that "Welsh and Santana did not create a bright-line rule requiring the underlying offense to be labeled a felony in order for exigent circumstances to justify a warrantless home entry." Ferguson, 317 Wis. 2d 586, ¶27 (footnote omitted) (citing Sanders, 311 Wis. 2d 257, ¶71 (Prosser, J., concurring)). We instead clarified that "courts, in evaluating whether a warrantless entry is justified by exigent circumstances, should consider whether the underlying offense is a jailable or nonjailable offense, rather than whether the legislature has labeled that offense a felony or a misdemeanor." Id., ¶29.

¶33 Since then, the Supreme Court has confirmed our view that Welsh and Santana do not create a felony-misdemeanor distinction, stating:

> [T]hough Santana involved a felony suspect, we did not expressly limit our holding based on that fact. . . . Welsh . . . [did not] involve[] hot pursuit. Thus, despite our emphasis in Welsh on the

20

> fact that the crime at issue was minor——indeed, a mere nonjailable civil offense——nothing in the opinion establishes that the seriousness of the crime is equally important in cases of hot pursuit.

Stanton v. Sims, 571 U.S. ___, 134 S. Ct. 3, 6 (2013) (per curiam) (citations omitted).  While the Court in Stanton acknowledged a "basic disagreement" among "federal and state courts nationwide . . . on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect," it did not "express [a] view" on the ultimate question.  Id. at 5, 7.  Consequently, Ferguson remains the law and dictates that the mere fact that the underlying offenses at issue in this case are misdemeanors is not a bar to application of the hot pursuit doctrine.

¶34 On the other hand, the State urges this court to establish a rule that "hot pursuit of a suspect based on probable cause for a jailable offense" will always justify a warrantless home entry and arrest.  We decline to conclude that the confluence of hot pursuit and probable cause to arrest for a jailable offense will always justify a warrantless entry.  The "touchstone of the Fourth Amendment is reasonableness," and "[r]easonableness . . . is measured in objective terms by examining the totality of the circumstances."  Ohio v. Robinette, 519 U.S. 33, 39 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)).

21

¶35 Evaluation of all the circumstances in this case convinces us that Deputy Dorshorst's entry into Weber's garage was constitutionally reasonable.

¶36 To begin with, Deputy Dorshorst was indeed engaged in "immediate or continuous pursuit of [a suspect] from the scene of a crime." Richter, 235 Wis. 2d 524, ¶32 (alteration in original) (quoting Smith, 131 Wis. 2d at 232). He was attempting to apprehend Weber, who was fleeing Deputy Dorshorst's lawful traffic stop on a public highway. There was no delay between Weber's illegal actions and Deputy Dorshorst's pursuit of Weber. Cf. id., ¶36 ("There is no evidence in this record of any delay in [the deputy's] response or pursuit that would have interrupted the immediacy and continuity of the situation and therefore dissipated the exigency.").

¶37 Next, violations of the statutes at issue, Wis. Stat. §§ 346.04(2t) and 946.41(1), are jailable offenses, Wis. Stat. §§ 346.17(2t), 946.41(1), 939.51(3)(a), and thus significantly grave. Cf. Ferguson, 317 Wis. 2d 586, ¶29 ("[C]ourts, in evaluating whether a warrantless entry is justified by exigent circumstances, should consider whether the underlying offense is a jailable or nonjailable offense . . . ."). The available penalties——up to nine months in prison for violations of each statute, §§ 346.17(2t), 946.41(1), 939.51(3)(a)——demonstrate that the State has a strong "interest in arresting individuals suspected of committing [these] offense[s]." Welsh, 466 U.S. at 754 n.14.

22

¶38 We note that Deputy Dorshorst's intrusion here was appropriately limited. Cf., e.g., Santana, 427 U.S. at 42-43 ("This case . . . is clearly governed by Warden [v. Hayden]; the need to act quickly here is even greater than in that case while the intrusion is much less." (emphasis added) (citing Hayden, 387 U.S. 294)); id. at 43-44 (White, J., concurring) ("In these circumstances, a warrant was not required to enter the house to make the arrest, at least where entry by force was not required." (emphasis added)).[10]  Deputy Dorshorst did not damage

---

[10] As part of its analysis in United States v. Santana, 427 U.S. 38 (1976), the Supreme Court examined whether Santana possessed an "expectation of privacy" while standing in the doorway of her home. See Santana, 427 U.S. at 42. One might argue that this reasoning is now suspect under two recent Supreme Court cases, United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012), and Florida v. Jardines, 569 U.S. ___, 133 S. Ct. 1409 (2013), to the extent those cases are read to emphasize the idea that "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas . . . [the Fourth Amendment] enumerates." Jones, 132 S. Ct. at 950; see Jardines, 133 S. Ct. at 1414.

(continued)

23

any property, open any doors or windows, or pull out any weapons. He simply stepped into Weber's open garage and seized his arm. The two actions——entry and apprehension——were calculated to accomplish no more than was absolutely necessary to halt Weber's escape. Additionally, the entry was a last resort. Deputy Dorshorst had already attempted to stop Weber by activating his emergency lights and calling after him; it was due to Weber's actions that Deputy Dorshorst was forced to enter the garage to accomplish the stop. Finally, Deputy Dorshorst ended the intrusion promptly, staying in the garage no longer than needed. Cf., e.g., State v. Legg, 633 N.W.2d 763, 773

---

Jones and Jardines are both search cases. See Jones, 132 S. Ct. at 949 ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" (footnote omitted)); id. at 958 (Alito, J., concurring) ("The Court does not contend that there was a seizure."); Jardines, 133 S. Ct. at 1414 ("We granted certiorari, limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment."). Moreover, the Santana court's discussion of Santana's expectation of privacy pertained to whether she was in a public place "when the police first sought to arrest" her at the "threshold of [her] dwelling," not whether the area in which she was actually arrested, "the vestibule of her house," was protected by the Fourth Amendment. Santana, 427 U.S. at 40-43. The Supreme Court's acknowledgement of the degree of the officers' "intrusion" in that case occurred during its subsequent consideration of whether the police could follow Santana into her house to effect an arrest. Id. at 42. Here, Weber was clearly in a public place when Deputy Dorshorst began his pursuit. And there is no dispute that a seizure eventually occurred in Weber's home. The question at issue is thus whether, under the totality of the circumstances, the seizure which undoubtedly occurred was constitutionally reasonable.

24

(Iowa 2001) ("Another important circumstance in this case is the nature of the intrusion. [The officer] entered [the defendant's] garage, not her house proper as in Santana or her bedroom as in Welsh. . . . In addition, the magnitude of the infringement was rather slight. [The officer's] entry into [the defendant's] garage was no surprise to her; he was following closely on her heels when she entered the garage. In addition, he entered through an open door and took only three steps inside. Thus, the intrusion was peaceful and restricted to that which was necessary to allow the officer to speak with [the defendant]." (citation omitted)); State v. Pinkard, 2010 WI 81, ¶¶41-42, 55, 327 Wis. 2d 346, 785 N.W.2d 592 (analyzing "reasonable[ness]" of "police conduct" in community caretaker context by considering, inter alia, "the degree of overt authority and force displayed," including whether "any of the . . . officers employed any force or drew their weapons" and "the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished" (quoting State v. Kramer, 2009 WI 14, ¶41, 315 Wis. 2d 414, 759 N.W.2d 598)).[11]

¶39 Deputy Dorshorst's actions in this case were manifestly reasonable. As the State observed at oral argument,

---

[11] Our community caretaker line of cases sets forth guidelines in a separate Fourth Amendment context for analyzing different aspects of intrusions by the State. See, e.g., State v. Pinkard, 2010 WI 81, ¶¶29, 41-42, 327 Wis. 2d 346, 785 N.W.2d 592. The cases are by no means controlling here, but are instead merely a helpful tool for discussing the reasonableness of Deputy Dorshorst's actions.

25

"this case is not about a bad brake light." Instead, it is about a defendant, Weber, who declined to submit to a law enforcement officer's lawful attempts to conduct a traffic stop. Had Weber chosen to stop on the highway, or even in his driveway, Deputy Dorshorst never would have entered his garage. This is not the type of conduct that the Fourth Amendment brands "unreasonable"; the Fourth Amendment does not dictate that officers who fail to outpace suspects on their way to a residence are unable to act. See Sanders, 311 Wis. 2d 257, ¶133 (Prosser, J., concurring) (quoting Blake, 468 N.E.2d at 553). Taking the time to obtain an arrest warrant in this case would have required Deputy Dorshorst to halt an arrest which had already begun outside of Weber's home, an arrest lawfully premised on probable cause that Weber had committed jailable offenses and one which required minimal intrusion to complete. For numerous policy reasons we have already discussed, an arrest warrant is simply not mandated under these circumstances. See, e.g., id. (Prosser, J., concurring) ("The enforcement of our criminal laws . . . is not a game where law enforcement officers are 'it' and one is 'safe' if one reaches 'home' before being tagged." (quoting Gasset v. State, 490 So. 2d 97, 98-99 (Fla. Dist. Ct. App. 1986) (denying certiorari))).[12]

---

[12] We are not persuaded by Weber's references to general language in Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013). McNeely did not involve the hot pursuit doctrine. McNeely, 133 S. Ct. at 1558 (describing question at issue as "whether the natural dissipation of alcohol in the bloodstream establishes a per se exigency that suffices on its own to

(continued)

¶40 A counterargument could be made that Deputy Dorshorst should nonetheless have attempted to secure a warrant to arrest Weber. Presumably, Deputy Dorshorst would have needed to stop at Weber's driveway and let Weber flee into the residence, then call for backup, secure a perimeter around the house so that Weber did not continue his attempts to escape law enforcement, and obtain a warrant. And then what? Would those who support this argument have Deputy Dorshorst knock on the door? Given that Weber was openly fleeing Deputy Dorshorst, it is far from clear Weber simply would have turned around and opened the door for him. If Weber did not open the door, was Deputy Dorshorst then to break the door in and apprehend Weber inside his actual house as opposed to inside his open garage? Especially compared to that scenario, an immediate and limited entry into Weber's open garage to complete the stop was an appropriate approach.

¶41 The court of appeals below settled upon a version of Weber's argument, stating that "the exigent circumstances requirement means that there must be a potential for danger to life, risk of evidence destruction, or likelihood of escape," Weber, unpublished slip op., ¶7, and suggested that such factors are not present in this case. Id., ¶9. This is a form of the "'hot pursuit plus' approach that upholds hot pursuits for offenses of varying degrees of seriousness where there are other exigent circumstances present, for example threats of violence

justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations").

27

or destroyed evidence, or other emergencies or dangerous situations." Sanders, 311 Wis. 2d 257, ¶153 (Butler, J., concurring) (emphasis added). But this approach is contradicted by our case law. See id., ¶118 (Prosser, J., concurring) ("There is no implication in our case law that 'hot pursuit' cannot stand alone as an exigent circumstance justifying a warrantless home entry and arrest. On the contrary, our cases explicitly recognize that hot pursuit is a sufficient justification for a warrantless entry and arrest." (citing Smith, 131 Wis. 2d at 229; Richter, 235 Wis. 2d 524, ¶29)).

¶42 In Richter, for example, this court upheld a warrantless entry into a trailer on the basis of both hot pursuit of a fleeing suspect and the need to protect the occupants of the trailer. Richter, 235 Wis. 2d 524, ¶2. But our analysis made clear that these were independent justifications. Id., ¶¶32-37, 41 ("We conclude that [the deputy's] entry was justified by the exigent circumstance of hot pursuit. The State also argues that this entry was justified by the exigency of a threat to the safety of the suspect or others. . . . [W]e conclude that [the deputy] reasonably believed that the intruder he was pursuing posed a threat to the safety of the occupants of Richter's trailer." (emphasis added)). And it would be somewhat strange to continually list "hot pursuit of a suspect" as one of "four well-recognized categories of exigent circumstances" separate from "a threat to the safety of a suspect or others," "a risk that evidence will be destroyed," and "a likelihood that the suspect will flee" if

28

one of these additional categories were required in order to justify a warrantless entry following hot pursuit of a suspect. Id., ¶29 (citing Smith, 131 Wis. 2d at 229); Ferguson, 317 Wis. 2d 586, ¶20 (quoting Richter, 235 Wis. 2d 524, ¶29). Although the presence of one or more of these additional exigencies is relevant to the question of whether a warrantless entry is permitted, it is not a prerequisite to application of the hot pursuit doctrine. See, e.g., Commonwealth v. Jewett, 31 N.E.3d 1079, 1089 n.8 (Mass. 2015) ("The defendant also attempts to argue that hot pursuit is not an exigency unto itself where the underlying crime is not felonious, but rather additional factors, such as the crime being violent or the suspect being armed, must be satisfied in order to justify a warrantless entry. We disagree with this contention."); People v. Wear, 867 N.E.2d 1027, 1045 (Ill. Ct. App. 2007) ("Most courts appear to take Santana's holding at face value, treating hot pursuit as an exception unto itself rather than as just another factor." (citations omitted)), aff'd, 893 N.E.2d 631 (2008); Sanders, 311 Wis. 2d 257, ¶¶119-32 (Prosser, J., concurring) (collecting cases).[13]

---

[13] The court of appeals below essentially relied on a discussion from this court's opinion in Smith to derive a test for exigent circumstances in the hot pursuit context, State v. Weber, No. 2014AP304-CR, unpublished slip op., ¶¶4, 7 (Wis. Ct. App. Oct. 8, 2015) (per curiam) (citing State v. Smith, 131 Wis. 2d 220, 229, 231, 388 N.W.2d 601 (1986), abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 601 (1986)), but as the Sanders concurrence explained, the test for exigent circumstances set forth in that case does not apply to the hot pursuit doctrine. See State v. Sanders,

(continued)

¶43 Before we conclude, we acknowledge the concern that applying the hot pursuit doctrine to uphold a warrantless entry in a case where fleeing law enforcement was itself the violation giving rise to the pursuit will lead to the application of the hot pursuit doctrine in every case involving a fleeing suspect, no matter the gravity of the first offense committed, since flight itself can constitute a jailable offense. The objection is a legitimate one, but it fails to persuade for several reasons. First, the State will not always be able to establish probable cause that the suspect was <u>knowingly</u> fleeing. Second, as stated above, we decline to adopt the per se rule set forth by the State. The "touchstone of the Fourth Amendment is reasonableness," and "[r]easonableness . . . is measured in objective terms by examining the totality of the circumstances." <u>Robinette</u>, 519 U.S. at 39 (quoting <u>Jimeno</u>, 500 U.S. at 250). Third, application of the hot pursuit doctrine in this scenario is not circular (i.e., the pursuit justifying the pursuit) because the legislature did not have to make knowingly fleeing a traffic stop a jailable offense, either at all or in all circumstances. That it has chosen to do so means that this court must treat it with the seriousness that it does other

---

311 Wis. 2d 257, ¶117 (Prosser, J., concurring) ("[Hot pursuit] is not part of the objective test set forth in <u>Smith</u> . . . ."). Additionally, <u>Smith</u> was not a hot pursuit case. See <u>Smith</u>, 131 Wis. 2d at 231-32 (summarily dismissing possibility of a hot pursuit claim in a single paragraph because "[t]he underlying offense . . . occurred nearly three weeks earlier").

jailable offenses.[14]   And fourth, a contrary holding would lead to the opposite problem: in <u>every</u> case involving a nonjailable offense, suspects would have an incentive to flee law enforcement because flight itself would not justify application of the hot pursuit doctrine.

¶44   The record demonstrates that Weber committed jailable offenses and attempted to evade lawful apprehension and that Deputy Dorshorst's pursuit and response was immediate and measured.   A warrant was not necessary here; it was reasonable for Deputy Dorshorst to effectuate the lawful arrest he had begun outside of Weber's home.

### V.   CONCLUSION

¶45   We conclude that the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber were constitutional because they were justified by the exigent

---

[14] For example, with regard to Wis. Stat. § 946.41(1), "[r]esisting or obstructing officer," we note that the legislature provided for steeper criminal penalties when a violation involves aggravating circumstances, such as injury to an officer, § 946.41(2r)-(2t), or, after a violator has given false information or placed physical evidence with intent to mislead an officer and a trier of fact at a criminal trial has considered this information or evidence, conviction of an innocent person as a result of that trial, § 946.41(2m).   The legislature could easily have taken similar steps in the opposite direction, instituting less significant penalties when resistance or obstruction is tied to potentially less serious circumstances, such as a traffic stop for a broken brake light. But it did not do so; any violation of § 946.41(1) is at least a Class A misdemeanor.   § 946.41(1).   Thus the legislature has indicated that it finds resistance or obstruction of an officer to be a serious matter regardless of the underlying circumstances.

circumstance of hot pursuit of a fleeing suspect who had committed jailable offenses.  The deputy had probable cause to believe that Weber had committed two jailable offenses, immediately pursued Weber, and performed a limited entry into Weber's open garage for the purpose of preventing Weber's continued flight.  Under these specific circumstances, the deputy's actions were constitutionally reasonable.  Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶46 DANIEL KELLY, J. *(concurring).* I write separately because I do not think there is probable cause to believe Mr. Weber committed jailable offenses before entering his garage, a conclusion that precludes deployment of the "hot pursuit" doctrine. I join the lead opinion's result, however, because there is a separate, and constitutionally-sufficient, basis for it.

¶47 Our task in this case is determining whether Deputy Dorshorst had the authority to pursue Richard L. Weber into his garage, and subsequently arrest and search him, without a warrant. Mr. Weber says the Wisconsin and United States Constitutions protected him from the deputy's warrantless intrusion (and, consequently, the search and arrest). The State, on the other hand, says Deputy Dorshorst was in hot pursuit of an individual who had committed two jailable offenses, and so was relieved of the obligation of obtaining a warrant before entering the garage and executing the arrest and search. I will address each of those asserted offenses separately, and then consider an alternative basis for Deputy Dorshorst's constitutionally-permissible entry into Mr. Weber's garage.

I

¶48 There is no evidence that, before Mr. Weber entered his garage, Deputy Dorshorst thought he was in hot pursuit of someone who had committed a jailable offense.[1] Instead, the

---

[1] The lead opinion's explanation of the "hot pursuit" doctrine is well-stated, and needs no further treatment here.

evidence demonstrates only that he was intent on performing a traffic stop. That's what he told dispatch when he followed Mr. Weber into his driveway. That's also what he told Mr. Weber after he apprehended him. And there is no indication a different or additional rationale made its way into the report Deputy Dorshorst ultimately prepared.[2] Nor was there any admissible evidence at the suppression hearing to suggest a different reason for entering Mr. Weber's garage.

¶49 But we don't require that a law enforcement officer have in mind, at the time he enters someone's home, a constitutionally-permissible reason for doing so. All we require is that the objective circumstances at the time could bring to mind a constitutionally-permissible basis for entry.[3] Although this standard invites post-hoc rationalizing of a law enforcement officer's intrusion into Fourth Amendment-protected spaces, we could hardly operate without such retrospective analyses. It would be patently unreasonable to task a law enforcement officer with the responsibility of being consciously aware, minute by minute, of every possible constitutional basis for the next step he takes in the discharge of his duties. We

---

[2] If Deputy Dorshorst had recorded such additional or different rationale in his report, I suspect it would have been offered at the suppression hearing to help him refresh his recollection of why he entered Mr. Weber's garage.

[3] "[W]hen an officer's Fourth Amendment search and seizure conduct is supported by an objectively ascertainable basis for probable cause or reasonable suspicion, the police conduct meets the Fourth Amendment's requirement of reasonableness, thereby causing subjective motivations to be of little concern." State v. Kramer, 2009 WI 14, ¶27, 315 Wis. 2d 414, 759 N.W.2d 598.

2

expect him to follow the training he receives in constitutional requirements, but when he executes a traffic stop it is also reasonable to expect he will concentrate entirely on the functional task at hand, while simultaneously minimizing risks to the person of interest, the immediately surrounding community, and himself.

¶50 So, the State properly invites us to go to the record and consider the facts of this case like a slow-motion review of a football play. Having received such an invitation, we would be remiss if our analysis was less than precise, or we allowed factual nuances to escape our attention.

A

¶51 The constitutional dimension of Deputy Dorshorst's interaction with Mr. Weber centers on the garage's threshold: The legitimacy of what occurred beyond it depends on what occurred before it. Therefore, I will first address the facts as they transpired up to the point that Mr. Weber's car crossed the garage's threshold, and determine whether they describe probable cause to believe he committed a jailable offense.

¶52 On April 20, 2012, Deputy Dorshorst was driving behind Mr. Weber as they were both traveling northbound on County Highway E in the town of Arpin. Deputy Dorshorst noticed that Mr. Weber's high-mounted brake light was not functioning properly, and so decided to initiate a traffic stop. Deputy Dorshorst testified that "I activated my emergency lights and he was turning into his driveway" off of County Highway E. The district attorney asked Deputy Dorshorst to clarify where he was

3

in relation to Mr. Weber when he activated his emergency lights. His response was that "he was probably when I activated my emergency lights maybe 100 feet prior to his driveway." Mr. Weber "continued down his driveway and into his garage." Deputy Dorshorst followed Mr. Weber into his driveway, and stopped outside the garage approximately fifteen to twenty feet behind Mr. Weber's car (which at that point was parked inside the garage). During this period of time, Deputy Dorshorst was contacting dispatch to notify the station he was initiating a traffic stop. Neither Deputy Dorshorst nor Mr. Weber had, at that point, exited their cars.

¶53 This is the extent of the facts, up to the point Mr. Weber parked his car in his garage, of which we have been apprised. The State finds in these few, bare facts probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t) (2011-12).[4] Because violation of that statute carries a potential jail sentence, the State asserts the "hot pursuit" doctrine to justify Deputy Dorshorst's decision to enter Mr. Weber's garage without a warrant.

¶54 If the State is right, if there really is probable cause to believe this offense occurred, then it is also right

---

[4] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

This statute commands that "[n]o operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer, or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits." Wis. Stat. § 346.04(2t).

4

that the "hot pursuit" doctrine allowed Deputy Dorshorst to enter the garage and conduct the search and arrest of Mr. Weber. State v. Ferguson, 2009 WI 50, ¶¶26-30, 317 Wis. 2d 586, 767 N.W.2d 187 (holding that hot pursuit may exist where an individual has committed a "jailable offense"). But this record discloses no probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t).

¶55 The lead opinion correctly notes that "probable cause" is not a terribly high standard. All one needs is evidence "sufficient to warrant a reasonable person to conclude that the defendant . . . committed or [was] in the process of committing an offense." State v. Blatterman, 2015 WI 46, ¶35, 362 Wis. 2d 138, 864 N.W.2d 26 (quoting State v. Richardson, 156 Wis. 2d 128, 148, 456 N.W.2d 830 (1990)). Here, that quantum of evidence must show that Mr. Weber:

1. Operated a vehicle;

2. Received a visible signal to stop his vehicle from a traffic officer or marked police vehicle;

3. Failed to stop his vehicle as promptly as safety reasonably permitted; and

4. Knowingly resisted the traffic officer by failing to stop his vehicle as required.

Wis. Stat. § 346.04(2t).

¶56 Mr. Weber does not contest the sufficiency of evidence to meet elements one through three, and the record confirms their satisfaction. Deputy Dorshorst observed Mr. Weber driving his car on a public highway, and followed him until he parked his car in the garage. There, Deputy Dorshorst observed Mr.

5

Weber exit the vehicle. Thus, we know Mr. Weber was operating the vehicle. As to element two, Deputy Dorshorst testified, without contradiction, that he activated his emergency lights while behind Mr. Weber on County Highway E, and that they were still on when both vehicles came to rest. The third element is a closer call, but the evidence appears sufficient to support it. Although it is difficult to know whether Mr. Weber could have safely and reasonably stopped his vehicle 100 feet after Deputy Dorshorst activated his emergency lights, we do know he was able to slow enough to enter his driveway within that space. And if that is true, then it must also be true that he could have stopped in the driveway. That is, it was not reasonably necessary for him to drive into his garage.

¶57 But that still leaves the fourth element. There is no probable cause to believe Mr. Weber violated this statute unless there is evidence that the failure to stop his vehicle on either the county highway or his driveway would lead "a reasonable person to conclude" Mr. Weber was knowingly resisting Deputy Dorshorst. On this, the record is silent.

¶58 It is certainly true that we do not need to wait until Mr. Weber announces he is intentionally resisting Deputy Dorshorst before we find this element satisfied. We may infer the intent to resist from conduct. State v. Stewart, 143 Wis. 2d 28, 35, 420 N.W.2d 44 (1988). However, his conduct in relation to this element is unremarkable. So completely unremarkable, in fact, that it compels me to depart from the lead opinion.

6

¶59 Maybe Mr. Weber could have stopped his car while still on County Highway E. He certainly could have stopped on the driveway. But was he knowingly resisting Deputy Dorshorst by parking in the garage instead of the driveway? Of course not. Deputy Dorshorst knew how far Mr. Weber could possibly go with his car——the garage. And after reviewing the record, so do we . . . unless we are to assume Mr. Weber was not planning to stop at the back wall. There is nothing, however, to suggest this. So we all know there was a sure and certain end to Mr. Weber's travels on the 20th of April, and whether it was the driveway or the garage, the difference is a matter of feet. Because Deputy Dorshorst knew the stopping point of Mr. Weber's car would be almost immediately in front of him, this gives us nothing at all from which he (or we) may conclude an intent to resist. Probable cause may not be a rigorous standard, but it still requires some plausible evidence. These facts are simply incapable of indicating the presence of the fourth element.

¶60 This is no small quibble. If these unremarkable facts satisfy the State's admittedly light burden, it is difficult to imagine a traffic stop that would not provide probable cause to believe a jailable offense has occurred. Traffic stops normally take place on public highways, which means there is no sure and certain place that a law enforcement officer knows the person will stop. The highway environment is much less controlled than here, the variables much greater. Traffic, weather, road conditions, road construction activity, lighting, all will play into when and where the motorist might decide he can stop as

7

"promptly as safety reasonably permit[s]." And that is before we even consider how quickly the motorist might recognize he is being signaled to stop. This means the distance a law enforcement officer might follow a driver before he pulls over can vary significantly. In the normal course of events, the officer assuredly cannot accurately predict, within a matter of feet, where the vehicle will come to rest (as he could here). So, unless an observant driver immediately slams on his brakes and comes to a screeching halt when he sees a patrol car's emergency lights, an officer who wants to search the car or arrest the driver will always be able to plausibly say the motorist could have stopped a few feet earlier.

¶61 On that last point, we would do well to keep in mind that the State is asserting there was "probable cause," not just "reasonable suspicion" to believe Mr. Weber violated this statute. That has consequences. Probable cause regarding a jailable offense doesn't just give law enforcement officers a basis for asserting "hot pursuit." It also authorizes them to arrest motorists and conduct warrantless searches of their persons and vehicles. Maryland v. Dyson, 527 U.S. 465 (1999) (per curiam) (stating that probable cause is sufficient for warrantless search under the "automobile exception" to the Fourth Amendment); State v. Paszek, 50 Wis. 2d 619, 624–25, 184 N.W.2d 836 (1971) (holding probable cause sufficient for arrest). Under the State's reading, this statute is so powerful it can transmogrify the most minor imaginable equipment malfunction——a burnt-out light——into permission for a

8

warrantless arrest and search. In finding probable cause here, we are telling Wisconsin's motorists that their protection from warrantless searches and arrests incident to traffic stops is not our constitution, but instead law enforcement officers' discretion. It cannot be that easy to elide constitutional safeguards. Not only does this record not support probable cause with respect to this statute, it <u>must</u> not.

¶62 The facts the State offers us reveal no probable cause to believe Mr. Weber violated Wis. Stat. § 346.04(2t). As a result, the State may not use the "hot pursuit" doctrine to justify Deputy Dorshorst's decision to enter Mr. Weber's garage without a warrant—at least with respect to this statute.

B

¶63 There is still, of course, the State's argument that Mr. Weber committed a second jailable offense capable of supporting its "hot pursuit" theory. If we include Mr. Weber's actions after entering his garage, the State says there was probable cause to believe Mr. Weber was resisting a law enforcement officer in violation of Wis. Stat. § 946.41(1) (another jailable offense). So now we extend the temporal horizon to reach those facts in determining whether they excuse the need for a warrant.

¶64 When the replay of events paused to conduct the analysis above, Mr. Weber was in his car in his garage. Deputy Dorshorst was in his patrol car on the driveway, just outside the garage with his emergency lights activated. And the only constitutionally-relevant facts ascertainable at that point were

9

that one of Mr. Weber's brake lights was out, and he had driven into the garage instead of stopping on the driveway. As already discussed, these facts support a traffic stop, but nothing more. The replay now picks up from there, and we learn the following.

¶65 Mr. Weber and Deputy Dorshorst exited their vehicles at about the same time. Mr. Weber started moving towards the door from the attached garage into his house. Simultaneously, Deputy Dorshorst moved towards the front of his patrol car in an effort to keep Mr. Weber in view. When Mr. Weber started walking up the stairs to the house door, Deputy Dorshorst told Mr. Weber he "needed to speak with him." When Mr. Weber did not stop, Deputy Dorshorst entered the garage and again told him he "needed to speak with him." Because this is the point at which Deputy Dorshorst passed into Fourth Amendment-protected space,[5] the replay must pause again so we can determine whether the objectively ascertainable facts at that point plausibly suggest a violation of Wis. Stat. § 946.41(1).[6]

---

[5] Technically, we count an attached garage as part of the "curtilage" of Mr. Weber's home. The curtilage comprises "the land and buildings immediately surrounding a house." State v. Martwick, 2000 WI 5, ¶1 n.2, 231 Wis. 2d 801, 604 N.W.2d 552 (citing United States v. Dunn, 480 U.S. 294, 300 (1987)). For purposes of Fourth Amendment analysis, we treat the curtilage as identical to the house itself. State v. Dumstrey, 2016 WI 3, ¶23, 366 Wis. 2d 64, 873 N.W.2d 502.

[6] A person violates this statute when he "knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority . . . ." Wis. Stat. § 946.41(1).

10

¶66 If the "hot pursuit" exception to the warrant requirement is to get Deputy Dorshorst inside the garage without a constitutional violation, there must be probable cause to believe Mr. Weber committed a jailable offense before he entered the garage. "We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson,[7] by the expedient of escaping to a private place." United States v. Santana, 427 U.S. 38, 43 (1976); see also State v. Smith, 131 Wis. 2d 220, 232, 388 N.W.2d 601 (1986) (quoting Welsh v. Wisconsin, 466 U.S. 740, 753 (1984)) (stating that hot pursuit occurs "where there is an 'immediate or continuous pursuit of [a suspect] from the scene of a crime'"). This makes sense——the entire purpose behind this exception is to prevent an offender's retreat into Fourth Amendment-protected space from frustrating an arrest that started outside that space.

¶67 So the problem with the State's argument is that the jailable offense must have commenced before Mr. Weber reached his garage. As discussed above, the objectively ascertainable facts by that point only supported Deputy Dorshorst's pursuit of Mr. Weber for a bad brake light. Driving with a dysfunctional light is not a jailable offense. Thus, nothing happened before Mr. Weber entered his garage capable of supporting a "hot pursuit" argument.

---

[7] United States v. Watson, 423 U.S. 411 (1976) (finding warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment).

¶68 Even if we could consider the facts transpiring after Mr. Weber entered the garage, there is nothing to support a reasonable belief that a jailable offense had occurred, or was in the process of happening. Before Deputy Dorshorst entered the garage, he said he told Mr. Weber that he "needed to speak with him." Mr. Weber, however, continued moving towards the door into his house. These additional facts, according to the State, are supposed to provide probable cause to believe Mr. Weber was knowingly resisting or obstructing an officer. To make such a showing, the State must demonstrate that Deputy Dorshorst was acting in an official capacity, that he exercised lawful authority, and that Mr. Weber knowingly resisted or obstructed what Deputy Dorshorst was lawfully trying to accomplish in his official capacity.

¶69 The State says the action with which Mr. Weber interfered was his refusal to stop when Deputy Dorshorst told him he "needed to speak with him." This depends, in part, on what was meant by the deputy's statement. "I need to speak with you," when considered in isolation, is of dubious import. It could potentially be understood as a request to speak immediately, a command that Mr. Weber speak with him at some point, or a command that Mr. Weber speak with him immediately. But when a deputy sheriff makes this statement when his patrol car is just a few feet away with its emergency lights flashing, the only reasonable understanding is that one must immediately cease whatever one is doing and give him your undivided attention.

12

¶70 Deputy Dorshorst intended his statement to restrict Mr. Weber's freedom to move about in his home. That is, he intended his words to effect a seizure of Mr. Weber just as surely as if he were physically restraining him. And it is reasonable to understand those words as such. Mr. Weber's failure to understand it that way (or heed the command) led Deputy Dorshorst to follow his words into the garage, and accomplish physically what his words could not.

¶71 Thus, the question is whether Deputy Dorshorst had lawful authority to command Mr. Weber to stop what he was doing and submit to questioning. The State's argument simply assumes we should answer that question affirmatively, but it provided no adequate explanation. This is a significant shortcoming; if, by nothing more than his command, an officer has the lawful authority to freeze a person in place such that the failure to comply justifies warrantless entry of his home, then the Fourth Amendment is a false promise.[8] An officer could manufacture a basis for crossing into protected space simply by commanding the occupant to come out. Failure to comply would justify an incursion to fetch him. This we do not tolerate. See generally City of Sheboygan v. Cesar, 2010 WI App 170, ¶18, 330

---

[8] Sutterfield v. City of Milwaukee, 751 F.3d 542, 550 (7th Cir. 2014) ("At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home."); Kylio v. United States, 533 U.S. 27, 31 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting Silverman v. United States, 365 U.S. 505, 511 (1961))).

13

Wis. 2d 760, 796 N.W.2d 429 (noting that people inside their homes may "ignore [the officers'] requests that [they] cooperate and choose not to speak with them," though the officers could still seek a warrant).

¶72 The State's argument doesn't hit true because it does not explain why Deputy Dorshorst can lawfully command a man in his own home to do anything under these circumstances. Without that, there can be no violation of Wis. Stat. § 946.41(1). And in the absence of a violation, the State cannot argue Deputy Dorshorst was in hot pursuit when he entered Mr. Weber's garage (even if we were to consider Mr. Weber's conduct after he entered his garage, which we may not do). If this was the end of the analysis, I would have to conclude that Deputy Dorshorst unconstitutionally entered Mr. Weber's garage. But it is not the end.

II

¶73 The reason Deputy Dorshorst could enter Mr. Weber's garage without violating constitutional guarantees is that Mr. Weber consented to his entry. Warrantless searches and seizures are not "unreasonable" within the meaning of the Fourth Amendment when the suspect consents. State v. Artic, 2010 WI 83, ¶29, 327 Wis. 2d 382, 786 N.W.2d 430.

¶74 When we consider this exception to the warrant requirement, we first look for words, gestures, or conduct that one can reasonably understand to manifest consent to the search. State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998).

14

We then examine the facts to ensure the suspect gave consent voluntarily——that is, "in the absence of duress or coercion, either express or implied." Id.

¶75 Here, Mr. Weber gave Deputy Dorshorst consent to enter his garage for the purpose of completing the traffic stop that had commenced on a public highway. As discussed above, Deputy Dorshorst initiated the traffic stop while both he and Mr. Weber were on County Highway E. Mr. Weber then slowed and pulled into his driveway. He did not, however, stop there. He instead pulled into his garage.

¶76 Had Mr. Weber chosen to stop in his driveway, which he clearly could have done, this case would not be before us. Deputy Dorshorst would have approached the car, spoken with Mr. Weber, observed the indicia of intoxication, and the remaining events would likely have unfolded as they actually did. But with one exception——it all would have happened outside constitutionally-protected space, and the sanctity of Mr. Weber's home would have remained intact.

¶77 The reason the events at issue took place in Mr. Weber's garage is because that is where Mr. Weber chose for them to take place. He was, without question, obligated to stop so that Deputy Dorshorst could investigate the defective brake light. State v. Gaulrapp, 207 Wis. 2d 600, 605, 558 N.W.2d 696 (1996) ("A traffic stop is generally reasonable if the officers have probable cause to believe that a traffic violation has occurred, or have grounds to reasonably suspect a violation has been or will be committed." (citation omitted)); see also

15

<u>Terry v. Ohio</u>, 392 U.S. 1, 22 (1968) ("[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"). That obligation attached when Deputy Dorshorst activated his emergency lights, and it persisted thereafter until the lawful incidents to a traffic stop were complete.

¶78 So as Mr. Weber continued from his driveway into his garage, he was operating under a continuing obligation to allow Deputy Dorshorst to complete the traffic stop that had commenced on County Highway E. Entering the garage did not terminate the obligation——it followed him inside. And because we presume that Wisconsin's citizens know the law,[9] we can conclude that Mr. Weber knew he was under this obligation.

¶79 Knowing his obligation, Mr. Weber chose where he would stop, and in doing so also chose where Deputy Dorshorst would perform his duties. His conduct would communicate to a reasonable observer that he preferred to complete the traffic stop in his garage, rather than on the driveway. Having extended that invitation, Mr. Weber may not fault Deputy Dorshorst for accepting it.

¶80 The next step in the "consent" analysis is to determine whether Mr. Weber was under any duress or coercion

---

[9] <u>State v. Neumann</u>, 2013 WI 58, ¶50 n.29, 348 Wis. 2d 455, 832 N.W.2d 560. This is the legal maxim of <u>ignorantia juris neminem excusat</u>, or "ignorance of the law excuses no one." Ignorantia Juris Non Excusat, <u>Black's Law Dictionary</u>, (10th ed. 2014).

16

(whether express or implied) to provide that consent. There are no facts of record to indicate he might have been. Indeed, quite the opposite is true. To the extent there was any duress or coercion in these facts, it was to <u>prevent</u> Mr. Weber from offering this conduct-based invitation to Deputy Dorshorst. The patrol car's emergency lights were an unequivocal command to submit to a traffic stop. Mr. Weber could have complied by stopping in his driveway. To the extent the emergency lights exerted coercion or duress, they certainly weren't encouraging Mr. Weber to proceed into his garage. Thus, Mr. Weber's consent was voluntary.

¶81 Consequently, it was not constitutionally unreasonable for Deputy Dorshorst to enter Mr. Weber's garage for the purpose of performing the traffic stop that had commenced on a public highway. A law enforcement officer may, during a lawful traffic stop, detain everyone in the vehicle. <u>Brendlin v. California</u>, 551 U.S. 249, 255 (2007) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" (quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979))). The scope and duration of the stop are limited by the purpose for effecting the stop: "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'——to address the traffic violation that warranted the stop, and attend to related safety concerns." <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1614 (2015) (citations omitted). Because of

17

the invitation Mr. Weber extended, Deputy Dorshorst was authorized to do all of this in the garage.

¶82 It is at this point that I rejoin the lead opinion. My need to write separately stemmed only from the State's constitutionally-insufficient (in my view) basis for justifying Deputy Dorshorst's presence in the garage. Because he did, in fact, have that authority (by virtue of the conduct-based invitation), he also had the lawful authority to command Mr. Weber to stop moving towards the house door so that he could complete the traffic stop. When Mr. Weber failed to comply, Deputy Dorshorst lawfully and appropriately restrained Mr. Weber's further progress. The discovery of incriminating evidence appropriately followed, as well as the conviction. For that reason, I join the lead opinion's conclusion that the court of appeals must be reversed.

¶83 ANN WALSH BRADLEY, J. *(dissenting).* Facts shape the contours of our constitutional guarantees. By lowering the standard to meet the facts in this case, the lead opinion would erode the constitutional rights of us all.[1] It sets a trajectory where, bit by bit, almost unnoticed, we may awaken one day to discover that the freedoms for which so many have fought and sacrificed have been severely curtailed.

¶84 Among those freedoms is the sanctity of the home and its curtilage. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748

---

[1] I use the term "lead" opinion for two reasons. First, I am concerned that without this cue, the reader may mistakenly believe that the lead opinion has any precedential value. Although four justices join in the mandate of the opinion to reverse the court of appeals (Zeigler, J., joined by Roggensack, C.J., Gableman, J. and Kelly, J.), it represents the reasoning of only three justices (Ziegler, J., joined by Roggensack, C.J., and Gableman, J.). Justice Kelly joined in the mandate, but would reverse on other grounds.

Although set forth in three separate opinions, four justices—a majority of the court—disagree with the reasoning of the lead opinion. Contrary to the lead opinion, four justices determine that there was neither probable cause nor exigent circumstances here (Abrahamson, J., Ann Walsh Bradley, J., Rebecca Grassl Bradley, J., and Kelly, J.).

Second, I use the term "lead" opinion because although it is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said "that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices." State v. Lynch, 2016 WI 66, ¶143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, J.J., concurring in part, dissenting in part) (citing Hoffer Props., LLC v. State, Dep't of Transp., 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533).

1

(1984) (citing <u>United States v. United States Dist. Ct.,</u> 407 U.S. 297, 313 (1972)).

¶85 Ignoring that the State has the burden to overcome the presumption of unreasonableness that attaches to warrantless physical entries of the home, the lead opinion determines that Deputy Dorshorst's warrantless entry into Richard Weber's garage and his subsequent arrest met the constitutional standard. It posits that Dorshorst was "justified by the exigent circumstance of hot pursuit of a fleeing suspect who had committed jailable offenses." Lead op., ¶3.

¶86 I agree with both Justice Daniel Kelly and Justice Rebecca Grassl Bradley that there was no probable cause to believe that Weber committed a jailable offense. Additionally, I agree that under no reasonable view of the facts of this case was there an emergency justifying an exception to the Fourth Amendment's warrant requirement. The alleged "hot pursuit" occurred for no more than a few seconds and emanated from a routine traffic violation, a mere non-jailable civil offense.

¶87 The lead opinion further errs by failing to apply the proper analysis for determining whether exigent circumstances justify warrantless entry into a suspect's home. Instead, it advances a per se rule that contravenes United States Supreme Court precedent.

¶88 Contrary to the lead opinion, and like a unanimous court of appeals, I conclude that the State failed to overcome the presumption of unreasonableness that attaches to a warrantless entry into a constitutionally protected area. Here,

2

the government's warrantless, non-consensual intrusion into Weber's garage and the resulting search and seizure violated the Fourth Amendment of the United States Constitution. Accordingly, I respectfully dissent.

I

¶89 During the daylight hours of April 20, 2012, Deputy Dorshorst noticed that Weber's vehicle had a defective high-mounted brake lamp.[2]  He also observed Weber's vehicle weave in its lane, deviating over the fog line.  The State concedes that Dorshorst did not have probable cause to initiate a traffic stop based upon the lane deviation, but instead asserts that he initiated the stop because of Weber's defective high-mounted brake lamp.

¶90 One hundred feet before Weber turned into his driveway, Deputy Dorshorst activated his emergency lights, but

---

[2] A toxicology report (Exhibit 1) was offered and received into the record at the preliminary hearing.  It provides that blood was "recovered from Richard L. Weber on April 20, 2012 at 1955 hours."

Judicial notice may be taken of matters of common knowledge, such as the time of sunset on April 20.  See, e.g., State ex rel. Schilling v. Baird, 65 Wis. 2d 394, 399, 222 N.W.2d 666 (1974).  On April 20, 2012, in the city of Arpin, Wood County, sunset began at 7:51 p.m and civil twilight ended at 8:21 p.m.  See Sunrise Sunset Calendar, Wisconsin Locations, http://www.sunrisesunset.com/usa/Wisconsin.asp (last visited Nov. 16, 2016).

Given the intervening events that occurred from the time Dorshorst initiated the traffic stop to when he placed Weber under arrest, it is reasonable to conclude that Dorshorst initiated the traffic stop during daylight, well before Weber's blood was drawn at 7:55 p.m.

did not turn on the siren in his squad car. The record does not reflect any of the usual indicia of fleeing, such as an increase in speed, a furtive glance back at the deputy or running from the vehicle. Instead, the record reflects that Weber continued to drive for a few seconds, turned into his driveway and entered his attached garage.

¶91 The one bit of testimony the State attempted to offer regarding an indicia of fleeing was excluded as speculative. Without any foundation, Deputy Dorshorst testified that "it seemed to me that he was attempting to evade me." Defense counsel immediately objected and the circuit court agreed, concluding that the testimony was speculative.

¶92 Leaving his emergency lights on, Deputy Dorshorst parked his squad car in Weber's driveway. He then got out of his squad car and saw Weber walking up the steps in his attached garage leading to the house door. Dorshorst followed him.

¶93 According to Deputy Dorshorst's subsequent testimony, he "was just entering the garage" when he told Weber he needed to speak to him. Weber did not respond, but continued up the steps within his garage toward the house door. While in the garage Dorshorst "secured [Weber's] arm" as Weber was "just inside his [house's] door" at the top of the steps. Deputy Dorshorst again advised Weber that he needed to talk to him.

¶94 Deputy Dorshorst testified that he then told Weber that "I needed to talk to him and the reason why I was stopping him was for his high mounted brake lamp." Dorshorst asked Weber

4

"to come out to his car so that I could point out exactly the reason for the stop and which light was defective."

¶95 After Dorshorst made contact with Weber he observed that Weber had slow, slurred speech, a strong odor of intoxicants, and glassy, bloodshot eyes. During their conversation, Weber admitted that he had been drinking.

¶96 Deputy Dorshorst testified that had he not entered Weber's garage he "would still have attempted to make contact with him." According to Dorshorst, "I would have still attempted either way knocking on his door or I would have attempted other means. I wouldn't have——I would not have just left." It is unclear from the record whether the "other means" referred to obtaining a search warrant.

¶97 Weber was never cited for the defective high-mounted brake lamp and the bit of testimony the State attempted to offer regarding an indicia of fleeing was excluded as speculative. Nevertheless, he was charged with resisting an officer by fleeing and other offenses. Ultimately, he pleaded no contest to operating with a prohibited alcohol concentration as a 9th or subsequent offense, resisting an officer and possession of marijuana.

II

¶98 As observed above, "(i)t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh, 466 U.S. at 748 (citing United States Dist. Ct., 407 U.S. at 313). Accordingly, it is a basic principle of Fourth Amendment law

that warrantless searches and seizures inside a home are "presumptively unreasonable." Id. at 749.

¶99 Under the Fourth Amendment, an attached garage has the same protections as the home. Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (the curtilage of the house "enjoys protection as part of the home itself."); see also State v. Dumstrey, 2016 WI 3, ¶35, 366 Wis. 2d 64, 873 N.W.2d 502 (courts have consistently concluded that a single family home's attached garage constitutes curtilage). This basic premise is not disputed by the parties because the State concedes that Weber's attached garage is curtilage.

¶100 The State has the burden to demonstrate both probable cause and "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welch, 466 U.S. at 750. I examine first whether the State has met its burden of demonstrating that Deputy Dorshorst had probable cause to arrest Weber for a jailable offense.

¶101 Probable cause exists where "the totality of the circumstances within the arresting officer's knowledge at the time of the arrest would lead a reasonable police officer to believe that the defendant probably committed a crime." State v. Koch, 175 Wis. 2d 684, 701, 499 N.W.2d 152 (1993). The totality of the circumstances that constitute probable cause to arrest "must be measured by the facts of the particular case." State v. Paszek, 50 Wis. 2d 619, 625, 184 N.W.2d 836 (1971).

¶102 The lead opinion concludes that "at the time he entered Weber's garage, Deputy Dorshorst had probable cause to

6

arrest Weber for violations of Wis. Stat. §§ 346.04(2t) [resisting by fleeing] and 946.41(1) [obstructing]." Lead op., ¶23. Jailable offenses of resisting and obstructing both require a suspect to "knowingly resist" an officer.[3] According to the lead opinion, it is reasonable to conclude that "Weber was likely feigning ignorance and thus fleeing" and that "most individuals would have responded to Deputy Dorshorst's obvious attempts to catch his attention." Lead op., ¶23. But this is the very type of assertion that the circuit court deemed inadmissible because it was speculative. Any assertion that Weber on that day knew he had a duty to stop and intentionally chose to comply with that obligation by pulling into his garage is likewise speculative.

¶103 The lead opinion is left with only one fact that is relevant to a determination of whether Deputy Dorshorst had probable cause to arrest Weber for "knowingly" resisting an officer. This is the fact that for a few seconds "Deputy Dorshorst activated his emergency lights while driving behind Weber's vehicle but Weber failed to pull over." Lead op., ¶23.

---

[3] Wis. Stat. § 346.04(2t) provides: "No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits."

Wis. Stat. § 946.41(1) provides: " . . . whoever knowingly resists or obstructs and officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."

7

¶104 Although Weber does not dispute that Deputy Dorshorst activated his emergency lights, he does dispute whether he saw those lights in the seconds before he turned into his driveway and parked his vehicle. Thus, when Weber disputes that he "knowingly" resisted an officer, he is in fact disputing that he received a visible signal or failed to stop promptly.

¶105 The record reflects that Deputy Dorshorst activated his emergency lights, but he did so only a few seconds before Weber turned into his driveway and parked his vehicle. Turning on the siren in his squad car may have given credence to the lead opinion's speculation about Weber's intent, but there is no dispute that Deputy Dorshorst failed to turn it on.

¶106 Additionally, the record does not reflect any of the usual indicia of fleeing, such as an increase in speed, a furtive glance back at the deputy or running from the vehicle. The one bit of testimony the state attempted to offer regarding Weber's intent was excluded as speculative.

¶107 Deputy Dorshorst did not enter the garage because Weber was fleeing from the scene of two jailable offenses. Rather, he followed Weber into his garage because of a minor traffic violation. According to Deputy Dorshorst's own testimony, "the reason why I was stopping him was for his high mounted brake lamp."

¶108 When Weber did not respond to Deputy Dorshorst's request to talk, Dorshorst followed Weber up the stairs of his attached garage and grabbed Weber's arm as he was just inside his house door. He then told Weber "to come out to his car so

8

that I could point out exactly the reason for the stop and which light was defective."

¶109 There are no additional facts in the record supporting a reason for the stop other than the defective high mounted brake lamp. Thus, the State has not met its burden of establishing that Deputy Dorshorst had probable cause to arrest Weber for a knowing violation of either Wis. Stat. §§ 346.04(2t) (resisting) or 946.41(1) (obstructing).

¶110 Without probable cause to arrest for resisting or obstructing an officer, the government's interest at the time Deputy Dorshorst entered Weber's home without a warrant was for a minor traffic violation. This minor offense does not justify "the chief evil" of entry into the home "against which the wording of the Fourth Amendment is directed." Welsh, 466 U.S. at 748 (citing United States Dist. Ct., 407 U.S. at 313).

III

¶111 The lead opinion's discussion of exigent circumstances is analytically unnecessary. There is no need to reach the issue of exigent circumstances unless as a threshold matter at least four Justices have determined that probable cause exists. Nevertheless, I address exigent circumstances to respond to the assertions of the lead opinion.

¶112 The State failed to meet its burden that there were exigent circumstances justifying Deputy Dorshort's warrantless intrusion into Weber's home. It bears "the heavy burden of trying to demonstrate exigent circumstances to overcome the presumption of unreasonableness" that attaches to warrantless

9

home entries. State v. Rodriguez, 2001 WI App 206, ¶9, 247 Wis. 2d 734, 634 N.W.2d 844 (citing Welsh, 466 U.S. at 750).

¶113 Under both Wisconsin and United States Supreme Court jurisprudence, it is well-established that "[w]arrantless entry is permissible only where there is urgent need to do so, coupled with insufficient time to secure a warrant." State v. Smith, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986) abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775; see also Missouri v. McNeely, 133 S. Ct. 1552, 1559 (2013) (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978) (a warrantless search is potentially reasonable only when "there is compelling need for official action and no time to secure a warrant.")). To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, courts examine the "totality of circumstances." McNeely, 133 S. Ct. at 1559.

¶114 The facts here cannot support a conclusion that Deputy Dorshorst had an urgent need to act with no time to support a warrant. For example, the facts of this case stand in stark contrast to the facts in United States v. Santana, 427 U.S. 38 (1976), which the lead opinion relies upon as a seminal case on the exigent circumstance of hot pursuit.

¶115 In Santana, the hot pursuit occurred when undercover officers rushed to Santana's residence after being informed that she had marked bills from their investigation in her possession. Id. at 39-40. When the officers arrived, they saw Santana standing in the doorway with a brown paper bag in her hand. Id.

10

at 40. As the officers shouted "police" and displayed their identification, Santana retreated into the vestibule of her house. Id.

¶116 As the Santana court explained, once Santana saw the police there was "a realistic expectation that any delay would result in destruction of evidence." Id. at 43. Thus, in Santana, there was both an urgent need to act and no time to secure a warrant because delay would lead to the loss of evidence in an undercover drug investigation.

¶117 The facts of this case could not be more different from those in Santana. Here, Deputy Dorshorst stopped Weber for a defective high-mounted brake lamp. In Santana, the police were in pursuit of a suspected drug dealer. Here, there was no evidence to destroy regardless of whether the focus of the analysis is on a defective high-mounted brake lamp or Weber's alleged flight from the police. In Santana, the police had to act immediately or evidence would be destroyed.

¶118 Any analysis of whether the State met the required showing that Deputy Dorshorst had an urgent need to act and no time to secure a warrant is completely absent from the lead opinion. Why? Because under the facts of this case it would be unable to meet the test.

¶119 Instead, the lead opinion shifts the analysis and contends that it would be unreasonable to expect Deputy Dorshorst to knock on Weber's front door or take the time to obtain a warrant, rather than invade his home. Lead op., ¶40. The lead opinion asserts that "Deputy Dorshorst would have

11

needed to stop at Weber's driveway and let Weber flee into the residence, then call for backup, secure a perimeter around the house so that Weber did not continue his attempts to escape law enforcement, and obtain a warrant." Lead op., ¶40. "And then what? Would those who support this argument have Deputy Dorshorst knock on the door?" Lead op., ¶40.

¶120 The answer is yes, because this is both what the law requires and what Deputy Dorshorst testified he would do. According to Dorshorst's own testimony, had he not entered Weber's garage he "would still have attempted to make contact with him." He explained, "I would have still attempted either way knocking on his door or I would have attempted other means. I wouldn't have——I would not have just left." Attempting to secure a warrant would not have allowed Weber to escape arrest or conviction.

¶121 In essence, Deputy Dorshorst assumed the role of a magistrate. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." Welsh, 46 U.S. at 751 (quoting McDonald v. United States, 335 U.S. 451, 460 (1948)). That is simply not possible here, when even Deputy Dorshorst acknowledged that he could have pursued alternative routes. He testified that had he not entered the garage he would have knocked on the door or pursued some other means to make contact with Weber.

12

¶122 Under these facts, the State has failed to show that Deputy Dorshorst had no time to get a warrant and that there was an urgent need to act. Accordingly, I conclude that the State has not met its burden of demonstrating exigent circumstances sufficient to overcome the presumption of unreasonableness that attaches to warrantless home entries.

IV

¶123 By advancing a per se rule that hot pursuit of a fleeing suspect is always an exigent circumstance, the lead opinion contravenes United States Supreme Court precedent. A per se exception to the Fourth Amendment is contrary to the United States Supreme Court's recent decision in McNeely, 133 S. Ct. at 1558-59. In McNeely, the Supreme Court declined to adopt a rule that the dissipation of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for non-consensual blood testing in drunk driving cases. Id. at 1556. Declining to adopt a categorical rule for drunk driving investigations, McNeely refused to "depart from a careful case-by-case assessment of exigency . . . ." Id. at 1561.

¶124 The lead opinion would create a per se exception while simultaneously asserting that it is doing no such thing.[4] See lead op., ¶43. Initially, it acknowledges and calls "legitimate" the concern "that applying the hot pursuit doctrine to uphold a warrantless entry in a case where fleeing law

_____

[4] At oral argument, the State conceded that it was seeking a bright-line rule in this case.

13

enforcement was itself the violation giving rise to the pursuit will lead to the application of the hot pursuit doctrine in every case involving a fleeing suspect . . .." Lead op., ¶43.

¶125 Then, in attempting to explain away the legitimacy of the concern, the lead opinion contends that it does not support a per se rule for four reasons: (1) the State will not always be able to establish probable cause; (2) reasonableness is measured in objective terms by examining the totality of the circumstances; (3) application of the hot pursuit doctrine is not circular because the legislature chose to make knowingly fleeing a jailable offense; and (4) a contrary holding would incentivize flight in every case involving a nonjailable offense. Id.

¶126 The lead opinion's first reason fails because it conflates probable cause with exigent circumstances. According to the lead opinion, it is not creating a per se rule in every case involving flight from an officer because "the State will not always be able to establish probable cause that the suspect was knowingly fleeing." Lead op., ¶43 (emphasis in original). However, as set forth above, the state must separately prove both probable cause to arrest and exigent circumstances in order to justify warrantless entry into Weber's home. Payton v. New York, 445 U.S. 573, 587-90 (1980). Thus, the lead opinion has created a per se rule because in every case where an officer has probable cause, the act of fleeing from an officer will be considered an exigent circumstance.

14

¶127 The lead opinion's second reason fails because there is no legal support for the proposition that Dorshort's entry was reasonable under the totality of the circumstances because it was a limited intrusion. In recent years, the United States Supreme Court has reaffirmed that the Fourth Amendment embodies "a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." United States v. Jones, 132 S. Ct. 945, 950 (2012).

¶128 Prior to Jones, courts employed the Katz "reasonable expectation of privacy" test in analyzing the Fourth Amendment's protections. See Katz v. United States, 389 U.S. 347, 351 (1967) (What a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."). However, Jones clarified that "the Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Jones, 132 S. Ct. at 952.

¶129 Additionally, in Jardines, the Supreme Court further explained that "an officer's leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters the Fourth Amendment's protected areas." 133 S. Ct. at 1415. Jardines acknowledged that the porch of a home is a semi-public area, but nonetheless determined that the use of a trained police dog on Jardines' porch was a search within the meaning of the Fourth Amendment. Id. at 1415-18.

¶130 Thus, Fourth Amendment jurisprudence emphasizing privacy over trespass is now inconsistent with Jones and

15

Jardines.[5]  In Santana, 427 U.S. at 42, on which the lead opinion relies in making its limited intrusion argument, the court determined that even though Santana was arrested in the threshold of her home, her Fourth Amendment rights were not violated because she "was not in an area where she had any expectation of privacy."  Id.  However, under Jones and Jardines, the reasonable expectation of privacy test may be "unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." Jardines, 133 S. Ct. at 1417; see also Jones, 132 S. Ct. at 951-52.

¶131 Nevertheless, the lead opinion turns a blind eye to current Fourth Amendment jurisprudence when it suggests that limited intrusions into the constitutionally protected areas are just fine.  Conflating this case with community caretaker cases, the lead opinion deems the trespass here reasonable because Deputy Dorshorst did not:

- damage any property;

---

[5] In a footnote, the lead opinion attempts to distinguish this case from Jones and Jardines by emphasizing that the latter two are "search cases."  Lead op., ¶38 n.10.  This distinction fails because a search occurred when Deputy Dorshorst physically occupied Weber's private property for the purpose of obtaining information.  See United States v. Jones, 132 S. Ct. 945, 949 (2012); see also Florida v. Jardines, 133 S. Ct. 1409, 1417 (2013) ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred."); United States v. Perea-Ray, 680 F.3d 1179, 1185 (9th Cir. 2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches.").

16

- open any doors or windows;

- pull out any weapons;

- stay in the constitutionally protected area longer than necessary; or

- enter the house proper, but instead entered only the curtilage of the house.  Lead op., ¶38.[6]

¶132 What the lead opinion misses is that we are not examining the reasonableness of the conduct once inside the constitutionally protected area, but rather whether the officer should have been in the protected area at all.  The legal analysis for determining whether exigent circumstances justify warrantless entry is entirely unrelated to the reasonableness factors considered under the community caretaker doctrine.

¶133 The third reason the lead opinion offers is logically flawed.  It asserts that the application of the hot pursuit doctrine in this case is not circular because the legislature chose to make knowingly fleeing a traffic offense jailable.  Although the lead opinion is correct that the seriousness of the

---

[6] The lead opinion relies on community caretaker cases. See, e.g., State v. Pinkard, 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592; State v. Kramer, 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598.  Yet, the legal analysis of exigent circumstances is distinct from the community caretaker doctrine.  Compare Michigan v. Tyler, 436 U.S. 499, 509 (1978) ("Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant."), with Pinkard, 327 Wis. 2d 346, ¶49 ("In considering the second reasonableness factor [under the community caretaker doctrine], we assess whether the time, location, the degree of overt authority and force displayed were appropriate under the circumstances.") (quotations and citation omitted).

17

underlying offense is a factor in determining whether there are exigent circumstances, the jailable offenses in this case emanate from the flight itself. This is circular reasoning because it departs from a case-by-case analysis and creates an exigency in every case where there is a flight, no matter how minor the underlying offense.

¶134 According to the lead opinion, exigent circumstances exist because Deputy Dorshorst had probable cause to arrest Weber for "two jailable offenses." Lead op., ¶3. The two jailable offenses the lead opinion references here are resisting an officer and obstructing an officer. Lead op., ¶23. It then reasons that Deputy Dorshorst was in hot pursuit because Weber was "a fleeing suspect who had committed jailable offenses." Lead op., ¶3. Thus, according to the lead opinion's circular logic, the crime from which Weber was fleeing was his own flight.

¶135 Finally, the lead opinion's fourth reason fails because a case-by-case rule is required, even if the State wishes to discourage suspects from fleeing the police. The lead opinion is correct that police officers and the communities they protect have a compelling interest in discouraging suspects from fleeing to their homes, but that interest must be balanced with the Fourth Amendment's fundamental protections. However, as McNeely explained, the State's interests are adequately addressed under a case-by-case analysis and do not justify "the 'considerable overgeneralization' that a per se rule would

18

reflect." 133 S. Ct. at 1561 (quoting Richards v. Wisconsin, 520 U.S. 385, 393 (1997)).

¶136 Ultimately, every rationale offered by the lead opinion in defense of its assertion that it has not created a per se rule is logically and legally unsound. In order to reach its conclusion, the lead opinion conflates legal doctrines, disregards controlling United States Supreme Court precedent and engages in flawed circular reasoning.

¶137 Accordingly, for the reasons set forth above, I respectfully dissent.

¶138 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

¶139 REBECCA GRASSL BRADLEY, J. *(dissenting)*. I agree with the lead opinion's holding that hot pursuit for a jailable offense can itself present exigent circumstances justifying warrantless entry into a citizen's home. This court has already said so. See State v. Ferguson, 2009 WI 50, ¶¶19-20, 26-30, 317 Wis. 2d 586, 767 N.W.2d 187; State v. Sanders, 2008 WI 85, ¶¶117-118, 311 Wis. 2d 257, 133-134 752 N.W.2d 713 (Prosser, J., concurring). I cannot join the lead opinion, however, because the facts in this record (1) do not show hot pursuit and (2) fail to establish that probable cause to arrest for a jailable offense existed before the deputy entered Weber's garage. The lead opinion——without precedent——extends the exigency of hot pursuit to the situation here where the jailable offense is the alleged "flight" itself. This circular expansion of hot pursuit doctrine violates the Fourth Amendment, which the Founding Fathers enshrined in our Constitution to protect the people from unwarranted government intrusion. Accordingly, I respectfully dissent.

¶140 The objective facts here do not support probable cause for a jailable offense and do not establish any exigent circumstance. Instead, the facts show a deputy concerned about a broken brake light who nevertheless had no urgent or immediate need to breach the threshold of Weber's home without first securing a warrant. Merely because the officer's actions in this case may not strike us as particularly offensive does not mean this court should lower its guard over constitutional rights:

1

> [I]llegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Boyd v. United States, 116 U.S. 616, 635 (1886).

¶141 Precisely because the absence of alarming facts in this case may render the court's encroachment on the Fourth Amendment a stealthy one, I write to caution against this latest contribution to the gradual depreciation of the right of a person to retreat into the home, free from unreasonable physical entry. The Fourth Amendment does not permit governmental intrusion into a person's home premised on a de minimis traffic law violation like a broken brake light. Entering the home without a warrant and absent any exigency is the "chief evil" against which the Fourth Amendment protects the people. See Welsh v. Wisconsin, 466 U.S. 740, 748 (1984).

¶142 Setting aside Fourth Amendment concerns, the deputy's actions do not seem egregious; if the deputy had done the same thing in a public place, his actions undoubtedly would not violate the Fourth Amendment. But seizing Weber inside Weber's protected curtilage absent any exigency triggers the Fourth Amendment's protection and makes the deputy's warrantless entry

2

constitutionally unreasonable.[1] Although the deputy's actions may seem less intrusive because he entered Weber's open garage rather than Weber's home, entering the garage is the constitutional equivalent of entering the home. The lead opinion's reasoning ignores this principle and opens the door for a future court to endorse an officer's warrantless entry into a home for a mere traffic violation.

I

¶143 The lead opinion concludes that this case involved hot pursuit. I disagree. Hot pursuit means "some sort of a chase." Sanders, 311 Wis. 2d 257, ¶109 (Prosser, J. concurring) (quoting United States v. Santana, 427 U.S. 38, 43 (1976)). "Hot pursuit describes the situation when the police are pursuing a suspect who is in the process of fleeing from a recently committed crime." State v. Naujoks, 637 N.W.2d 101, 109 (Iowa 2001) (citing Warden v. Hayden, 387 U.S. 294, 298-99 (1967)). It is the "immediate or continuous pursuit of the [suspect] from the scene of the crime." Welsh, 466 U.S. at 753. Although hot pursuit is not defined in terms of a particular length of time, it does involve some sort of chase and requires the recent commission of a jailable crime. The chase commences from the scene of the crime, triggering the hot pursuit.

---

[1] There is no dispute that Weber's attached garage is the equivalent of his home and therefore receives the same Fourth Amendment protections. See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (explaining that the curtilage "enjoys [the same] protection as part of the home itself"); see also State v. Dumstrey, 2016 WI 3, ¶35, 366 Wis. 2d 64, 873 N.W.2d 502 (noting that a single family home's attached garage is curtilage).

3

¶144 Calling what happened here "hot pursuit" stretches that term too far. "[A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." Welsh, 466 U.S. at 753 (involving first-offense drunk driving). The facts here show there was no chase. The deputy followed Weber 100 feet while Weber slowed his car down to turn into his driveway. There was no recently committed jailable crime prompting the pursuit, nor was there a crime scene from which Weber fled. Weber was driving with a broken brake light. That is not a jailable crime.

¶145 It may be tempting to validate the deputy's actions here in order to discourage traffic violators and serious criminals from ignoring the police and racing home to avoid traffic stops or police investigation. Fourth Amendment protections, however, cannot be jettisoned based on fear that some citizens may attempt to run home and hide. The 100 feet Weber travelled did not create an exigency because the deputy was not "chasing" Weber for a jailable crime recently committed.[2] There are, however, factual scenarios where a pursuit of 100

---

[2] Although the information discovered after the deputy breached the garage threshold revealed that Weber had been drinking and driving, our Constitutional decisions must not be influenced by evidence obtained after an unlawful entry. See, e.g., Missouri v. McNeely, 133 S. Ct. 1552 (2013) (excluding warrantless blood test showing driver had illegal BAC because search was unlawful under Fourth Amendment).

4

feet or an even shorter distance will justify warrantless entry. See, e.g., Santana, 427 U.S. at 43.

¶146 We need not identify a precise distance that is acceptable or unacceptable because the Fourth Amendment draws the line at probable cause, exigency, and reasonableness. Police may enter a person's home without a warrant only if there is probable cause to believe a jailable crime has been committed, a suspect's flight creates an exigency such that there is no time to get a warrant, and the search or seizure is reasonable.

## II

¶147 The lead opinion essentially concludes the jailable offense at issue here was Weber's "flight." The Fourth Amendment, however, does not support warrantless entry into a home when the jailable offense justifying entry is the flight itself. To condone warrantless entry into the home, Fourth Amendment jurisprudence requires probable cause that a jailable offense occurred before the flight began. If the flight itself creates the jailable offense that serves as an exigency and overcomes Fourth Amendment protections, a police officer can in essence create a jailable offense out of any attempted traffic stop or any attempt to speak with a citizen——even though no other jailable offense has occurred. At the point the deputy entered Weber's garage, all he knew was that Weber had a defective high-mounted brake lamp, pulled into his garage, walked to the door of his house inside the garage, and did not respond to the deputy's request to talk.

5

¶148 At the time the deputy seized Weber, the deputy's sole concern was the defective high-mounted brake lamp.  When asked why he tried to stop Weber, the deputy answered, "I attempted to stop him for defective high mounted brake lamp," and he added that he notified dispatch he "had a traffic stop."  Clearly, to the deputy this stop was not about pursuing Weber for a jailable offense.  It was about a broken brake light and the need to tell Weber about it.

¶149 The lead opinion points out that the officer's subjective motivation does not govern our review; instead, we review the objective facts.  See lead op., ¶19 n.6.  But the objective facts are clear:  There was no recently committed jailable offense that sparked a hot pursuit into Weber's home.  There was an attempted traffic stop for a broken brake light.  The motorist showed no indication of knowing the deputy activated his squad car's emergency lights.  The motorist slowed down, drove 100 feet, turned into his driveway, pulled into his garage, and walked to the door of the house.  Because the law does not support warrantless entry under these circumstances, I respectfully dissent.